John K. Crossman
ZUKERMAN GORE BRANDEIS & CROSSMAN, LLP
875 Third Avenue
New York, New York 10022
Tel.:  (212) 223-6700
*Attorneys for Defendants*
*Kari Sigerson and Miranda Morrison*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                   :

FISHER SIGERSON MORRISON LLC,       :

                         Plaintiff,    : Civil Action No.  11 civ 3440 (PKC)
                                   :

               - against -          :

KARI SIGERSON and MIRANDA MORRISON,  :

                        Defendants.   :
                                   :
------------------------------------------------------------------ X

## OPPOSITION TO PLAINITIFF'S
## <u>ORDER TO SHOW CAUSE</u>

John K. Crossman
ZUKERMAN GORE BRANDEIS
& CROSSMAN, LLP
875 Third Avenue
New York, New York 10022
Tel.:  (212) 223-6700
*Attorneys for Defendants*
*Kari Sigerson and Miranda Morrison*

## **TABLE OF CONTENTS**

Table of Authorities ..................................................................................iv-vi

PRELIMINARY STATEMENT ............................................................. 1

STATEMENT OF FACTS ...................................................................... 1

    Kari and Miranda Sell The Business to FSM,
    Become Employees, and Acquire a License................................ 1

    Fisher Cheats His Italian Factories ........................................... 2

    FSM Suddenly Fires Kari and Miranda, Demands Payment ....... 3

    FSM Fabricates A "For Cause" Pretense For Termination ......... 3

    Kari and Miranda Seek to Liquidate their Stock ...................... 4

    FSM Files This Lawsuit ............................................................ 7

    The TRO Hearing Before Judge McMahon ............................... 8

    The Court Allows The Sale ....................................................... 9

ARGUMENT ............................................................................................................. 10

I.  PLAINTIFF HAS NOT PROVEN THE ELEMENTS
    FOR AN INJUNCTION .................................................................................... 10

II. PLAINTIFF IS UNLIKELY TO SUCEED ON THE MERITS ................................. 12

    A.   Plaintiff's Application Is Based Upon Errors ......................................... 12

    B.    FSM's Trademark Claims Are Not Likely To Succeed ......................... 13

         1.   Kari and Miranda Have The Right To Resell
              FSM Shoes Per The First Sale Doctrine ........................................... 14

         2.   FSM Did Not Acquire The Right To Use "Sigerson" or "Morrison".............. 15

         3.   The Surnames "Sigerson" and "Morrison"
              Are Subject To The Fair Use Defense ............................................. 17

    C.   FSM Cannot Obtain An Injunction Enforcing the Covenant Not To
         Compete Because Kari and Miranda Were Terminated Without Cause .............. 18

    D.    Plaintiff's Claims Are Subject To Dismissal For Prior Action Pending.............. 23

    E.   Plaintiff's Breach of the Employment Contract Precludes
         Plaintiff From Suing On That Contract ............................................... 23

III. If An Injunction Is Entered, Defendants Should Post A Bond .................................. 24

CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

<u>Cases</u>

*Blumenthal v. Merril Lynch, Pierce, Fenner & Smith, Inc.*,
910 F.2d 1049 (2d Cir. 1990) .......................................................................................... 24

*Borne Chemical Co. v. Dictrow*,
85 A.D.2d 646, 649,445 N.Y.S.2d 406 (2d Dep't 1981) ................................................. 24

*Cf, Polymer Technology Corp. v. Mimran*,
975 F2d 58 (2d Cir. 1992) ................................................................................................ 15

*CBS, Inc. v. Tee Vee Records, Inc.*,
96 F.R.D. 163 (D.C.N.Y. 1982) ....................................................................................... 23

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,
321 F.3d 878 (9th Cir. 2003) ............................................................................................ 24

*Cornell v. T. V. Development Corp.*,
17 N.Y.2d 69, 215 N.E.2d 349 (NY 1966) ...................................................................... 24

*Dutcher v. Harker*,
377 S.W.2d 140 (Mo. Ct. App. 1964) .............................................................................. 15

*eBay, Inc. v. MercExchange*,
547 U.S. 388 (2006) .......................................................................................................... 11

*GFI Brokers, LLC v. Santana*,
2008 WL 3166972 (S.D.N.Y. Aug. 6, 2008) ................................................................... 22

*Hartzell v. Burdick*,
91 Misc.2d 758, 398 N.Y.S.2d 649 (N.Y.City Ct. 1977) ................................................ 23

*JA Apparel Corp. v. Abboud*,
682 F.Supp.2d 294 (S.D.N.Y. 2010) .................................................................... 16, 17, 18

*Jondora Music Publ'g Co. v. Melody Recordings, Inc.*,
351 F.Supp. 572 (D.N.J.1972) ......................................................................................... 12

*Joseph Scott Co. v. Scott Swimming Pools*,
764 F.2d 62 (2d Cir. 1985) ............................................................................................... 17

*Kanan, Corbin, Schupak & Aronow, Inc. v. FD International, Ltd.*,
8 Misc.3d 412, 797 N.Y.S.2d 883 (Sup. Ct. N.Y Cty. 2005) ........................................... 22

*MicroStrategy Inc. v. Motorola, Inc.*,
 245 F.3d 335 (4th Cir. 2001) ........................................ 11

*New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*,
442 F.3d 101 (2d Cir. 2006).......................................... 23

*O.D.F. Optronics Ltd. v. Remington Arms Co*,
2000 WL 4410130 (S.D.N.Y. 2008).......................................... 14

*Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*,
 2002 WL 59434 (S.D.N.Y. 2002).......................................... 12

*Photonics Industries Intern., Inc. v. Zhao*,
39 A.D.3d 610, 832 N.Y.S.2d 298 (2d Dep't 2007)........................................ 22

*Ralph Bros. Furniture Co. v. Ralph*,
45 U.S.P.Q. 375 (Pa. 1940).......................................... 16

*Rogers v. HSN Direct Joint Venture*,
1999 WL 728651 (S.D.N.Y. Sept. 17, 1999)................................... 15

*Ryan v. Volpone Stamp Company*,
107 F. Supp. 2d 369 (S.D.N.Y. 2000).......................................... 14

*Salinger v. Colting*,
607 F.3d 68 (2d Cir. 2010)................................................ 11, 12

*Sangui Biotech Intern., Inc. v. Kappes*,
179 F.Supp.2d 1240 (D.Colo. 2002).......................................... 12

*Scotts Co. v. United Indus. Corp.*,
315 F.3d 264 (4th Cir. 2002) ........................................ 11

*Taylor Wine Co. v. Bully Hill Vineyards, Inc.*,
569 F.2d 731 (2d Cir. 1978).......................................... 16

*Tom Doherty Assocs. v. Saban Entm't*,
60 F.3d 27  (2d Cir. 1995).......................................... 11

*Virgin Enters. Ltd v. Nawab*,
335 F.3d 141 (2d Cir. 2003).......................................... 14

Statutes

15 U.S.C. §1114(1) ........................................................................... 13

28 U.S.C. § 1927 ................................................................................ 1

Defendants Kari Sigerson and Miranda Morrison ("Kari and Miranda ") submit this memorandum and the Declarations of Miranda Morrison, Kari Sigerson, and John K. Crossman, in opposition to the application of plaintiff Fisher Sigerson Morrison, LLC ("FSM"), for a preliminary injunction and in support of their cross-application pursuant to 28 U.S.C. § 1927 for costs and attorney's fees.

## PRELIMINARY STATEMENT

Last week, on an emergency application, FSM sought, and to a limited extent, obtained a TRO restricting Kari and Miranda from selling branded shoes that they had a clear written license and a legal right to sell. FSM had no reasonable basis to seek such relief, and for the reasons set forth herein, this Court in equity should not only vacate the remaining TRO and deny the requested preliminary injunction, it should do so in a decision that leaves no doubt that FSM lacks the legal right to restrict Kari and Miranda (a) from trying to find work or (b) from using their own surnames to do so.

## STATEMENT OF FACTS

Defendants Kari Sigerson and Miranda Morrison are two designers of women's shoes. In 1991 Kari and Miranda founded a shoe company known by the name "Sigerson Morrison."  The brand developed a reputation for excellent design, high-quality manufacture, and timeless style. Its shoes were prototyped and manufactured predominantly in Italy, under the supervision of Kari and Miranda.

Kari and Miranda Sell The Business to FSM,
Become Employees, and Acquire a License

In 2006, Kari and Miranda sold the majority of the shares in their business to Marc Fisher and Marc Fisher Footwear. At the same time, Marc Fisher Footwear changed its name to "Fisher Sigerson Morrison."  FSM proceeded to conduct its business under

1

the trade name "Sigerson & Morrison," which FSM had acquired in the 2006 sale. At the conclusion of the sale, Marc Fisher, through his holding companies, owned 80% of FSM, and Kari and Miranda each owned 10% of FSM. Those ownership percentages remain the same today.

As part of the consideration for their sale of the business, Kari and Miranda received seven-year employment contracts that guaranteed them substantial incomes over the life of the contracts, as well as payments in the event they were terminated prematurely without cause. (See Employment Agreements, attached as Exhs. 1 and 2 to Declaration of Miranda Morrison).

Kari and Miranda also received a license from Fisher to operate a shoe store under the name Sigerson & Morrison (the "71st Street Store"). The license for the 71st Street Store was reduced to writing. (See "License Agreement," attached as Exh. 3 to Morrison Decl.). Pursuant to the License Agreement, Fisher agreed to sell, and did sell, to the 71st Street Store regular inventories of shoes at favorable wholesale prices.

Fisher Cheats His Italian Factories

Following his acquisition of the business, Fisher began to shift production of the brand's shoes from Italy to China. In addition, commencing in or about 2010, Fisher started a practice of knocking off his own shoes: having Italian factories use their expertise to build prototype shoes, but then taking those prototypes to China to have the actual production runs manufactured at much lower cost (thereby cheating the Italian factories that had prepared the prototypes in order to obtain the production orders).

In or about February of 2011, Marc Fisher decided to complete his transition to China. He shifted all of his production to China, ended his relations with the Italian

office, and refused to pay the Italian factories for monies owed. At around the same time,

Fisher announced the decision to lower the "price point" at which shoes bearing the

Sigerson & Morrison trademark were sold.

<u>FSM Suddenly Fires Kari and Miranda, Demands Payment</u>

In early 2011, Kari and Miranda placed orders for Spring merchandise from FSM

so that they could sell those goods at the 71st Street Store.  FSM accepted those orders

without complaint or notice of any issues. Several months later, in or about early March

2011, Matt Burris, who is FSM's CFO, invited Kari and Miranda to visit him at FSM's

showroom at Trump Tower, apparently to discuss the delivery of merchandise.  However,

at that meeting on March 10, 2011, Burris unexpectedly handed Kari and Miranda

paperwork terminating Kari and Miranda's employment.  (The Notice of Termination

letters are attached as Exhs. 4 and 5 to the Morrison Decl.).

At the same time as FSM terminated Kari and Miranda, on March 10, 2011, it

delivered a 90-day notice to them demanding payment for shoes sold to the 71st Street

Store. (Exh. 6 to Morrison Decl.).  Following receipt of such a notice, the License

Agreement for the store expressly entitled Kari and Miranda to liquidate any inventory.

(License Agreement, Exh. 3 to Morrison Decl., at p. 4).

FSM Fabricates A "For Cause"
<u>Pretense For Termination</u>

Fisher was well-aware that pursuant to their employment contracts, Fisher owed

to Kari and Miranda substantial payments. However, in a bad faith effort to avoid his

obligations, Fisher claimed to terminate Kari and Miranda "for cause" even though no

cause existed for their termination.

Following this bad faith termination, Kari and Miranda's attorneys attempted to remonstrate with FSM's attorneys for several weeks, and to have FSM review their claims, but those discussions were unsuccessful, and on April 6, 2011, Kari and Miranda filed suit against Fisher in N.Y. State Supreme Court, alleging breach of contract, gender discrimination, etc. (the "State Court Complaint," Exh. 1 to Crossman Decl.).

At the same time that Kari and Miranda were filing their suit against FSM, FSM surprised Kari and Miranda by filing a simultaneous suit in Nassau County, New York, alleging facially inadequate claims of breach of their employment contracts (the "FSM State Court Complaint," attached as Exh. 2 to Crossman Decl.; referred to with the State Court Complaint as the "State Court Action.").  FSM's filing in Nassau County was itself in bad faith.  Neither Kari, Miranda, nor FSM had any connection to Nassau County. The facts of the case itself had no connection to Nassau County.  Eventually, Kari and Miranda were about to file their motion to transfer the case to New York County, where substantial events occurred and where FSM maintained offices and showrooms, and where Kari and Miranda had worked. At that time, FSM hired new attorneys, who agreed to transfer the case to New York County. On information and belief, the inconvenient venue of the original action had been chosen by FSM as a way to drive up the costs of the litigation for Kari and Miranda, two individuals of limited means.

<u>Kari and Miranda Seek to Liquidate their Stock</u>

In the face of Fisher's refusal to ship shoes to the store, coupled with Kari and Miranda having been fired without cause, Kari and Miranda had no choice but to close the 71st Street Store.  (Sigerson Decl. at ¶14).

In May 2011, as permitted by the License Agreement for the 71st Street Store, Kari and Miranda announced that they would hold a sale to liquidate the inventory of the store. Kari and Miranda accurately announced that they would be selling shoes bearing the Sigerson & Morrison trademark. All of the shoes that were subject to sale were shoes that FSM had sold to the 71st Street Store pursuant to the License Agreement. The sale was designed to effectively liquidate the inventory over the course of a weekend, May 20-22, 2011.   (Morrison Decl. at ¶17).

As part of the License Agreement for the 71st Street Store, the store was prohibited from revealing to the public the fact that the store was separately owned and operated. (License Agreement, Exh. 3 to Morrison Decl., at p. 2).  The License Agreement provides:  "FSM and KM agree that to the customers the 71st store will appear to be just another Sigerson Morrison store.  Any actions to identify it as a separate entity or otherwise differentiate it in the customers mind will be a violation of the agreement." *Id*.

Presumably as a consequence of the public perception of the 71st Street, when Kari and Miranda announced the liquidation sale, it appears that some questions were raised by certain people about to whose store was being closed – an effect exactly in line with the requirements specified by FSM in the License Agreement, albeit an effect which FSM determined to be undesirable in this particular instance. According to FSM, some members of the public thought that FSM was closing stores other than the 71st Street Store. To the extent that such a perception may have arisen, it appears to have been caused, at least in part, by the fact that FSM apparently *was* closing at least some of its

stores. For example, it appears that on or about May 6, 2011, FSM announced the closure of at least its Los Angeles store, if not all of its stores.  (Exh. 7 to Morrison Decl.).

On May 18, FSM's attorneys wrote seeking to have Kari and Miranda cancel the sale, issue a corrective press release, and take other action. (May 18 Letter, Exh. 3 to Crossman Decl.). FSM's attorneys gave a deadline of noon on May 19 for Kari and Miranda to respond. On May 19, within the time provided by FSM's letter, Kari and Miranda's attorneys responded on their behalf and, although declining to cancel the sale (which was fully authorized under the License Agreement), readily agreed to issue a press release, to post signs, to send emails, and generally to make any truthful statement that would help to avoid confusion. (May 19 Letter, Exh. 4 to Crossman Decl.).

About an hour later, at around 12:45 p.m., FSM's attorneys called counsel for Kari and Miranda and left a message claiming that they were ready to discuss what steps could be taken to clarify public perceptions. Simultaneously, FSM counsel sent an email to the same effect. Within minutes, counsel for Kari and Miranda called back and at once attempted to negotiate public statements, signage for the sale, and other methods for satisfying FSM's concerns about public perception of the sale. In the course of that call, FSM attorneys stated that in fact they could not negotiate such actions at that time because they were too busy finalizing motion papers seeking a TRO. Counsel for FSM explained that they had employed five (5) attorneys overnight to prepare the papers, which were still not finished.

Counsel for Kari and Miranda suggested that it might be a better use of everyone's time to work out a joint press release and other specifics such as the wording on signage that Kari and Miranda would display at the sale, but FSM counsel was

unwilling to engage in such discussions at that time. Counsel for Kari and Miranda then wrote to FSM counsel and proposed that some other attorney from FSM's law firm could perhaps call back to work out an agreed public statement, emails, and the like. (May 19 Letter, Exh. 5 to Crossman Decl.).  FSM's counsel said they would call counsel for Kari and Miranda later in the day to negotiate any public statement.

FSM's counsel allowed the remainder of the business day to pass without any negotiations. Although FSM counsel had promised to call, he never called.

FSM Files This Lawsuit

At around 4:00 p.m. on May 19, FSM counsel sent a courtesy copy of papers filed in New York State Court, including a second, newly-filed complaint by FSM (the "Second FSM Complaint"). FSM's counsel indicated that according to the New York Court Clerk, a judge would not be assigned to the case until Friday at 11:00 a.m. The Second FSM Complaint among other things contained two claims for relief under the Lanham Act.  FSM's complaint also included three counts for breach of contract, including a count for "breach of employment agreements" in which FSM claims breach of the very same employment agreements at issue in the State Court Action.  In specific, FSM claims that Kari and Miranda breached their employment contracts by "engaging in a business that competes with FSM within a period of twelve months after termination of defendants' employment…"  FSM's Second Complaint at p. 14, ¶ 55.

Later that night, May 19, FSM counsel retreated from their promise to have a telephone call to discuss matters, and instead sent a written demand for certain press release and signage language. (Email, May 19, 6:20 p.m, Exh. 6 to Crossman Decl.). It was already after business hours on the eve of the liquidation sale. In that same email

demand, FSM also demanded that Kari and Miranda capitulate on a variety of issues that were already in dispute in the State Court Action.

Under great time pressure owing to the imminent sale, Kari and Miranda prepared and sent a press release as requested, and made up large signs to display at the sale. (Sigerson Decl. at ¶ 20;  Exhs. 7, 12, and 13 to Crossman Decl.).  Kari and Miranda rejected FSM's attempt to force them to capitulate on issues in dispute in the State Court Action. (Email May 19, Exh. 8 to Crossman Decl.).

The TRO Hearing Before Judge McMahon

First thing in the morning of May 20, Kari and Miranda removed this case to Federal Court. Moments after the removal was effective, we advised FSM counsel of same and asked how counsel wished to proceed. Within minutes, it was determined that this Court was not available, and that as a result, the matter would be heard by the Part One Judge, who on that day was the Hon. Colleen McMahon. By approximately 11:30 a.m. on Friday, both sides were in Court before Judge McMahon on the TRO.

Initially, with the sale scheduled to commence in about 90 minutes, based upon FSM's papers and an extremely abbreviated, off-the-record argument, Judge McMahon issued a temporary restraining order barring the sale until further order of the Court. (Exh. 9 to Crossman Decl.).

Then, following a short recess during which the Court reviewed FSM's filing, including the License Agreement authorizing Kari and Miranda to sell their inventory, as well as two cases handed up by counsel for Kari and Miranda, Judge McMahon resumed the bench, and after asking some questions of counsel on the record, announced her decision and entered an order allowing the sale to go forward, on the condition that Kari

and Miranda issue a press release to certain email addresses, maintain certain signs during the sale, and distributed certain hand-outs at the sale, and that they have no further sale pending hearing.  (Exh. 10 to Crossman Decl.).

In so ruling, Judge McMahon observed that at least as a preliminary matter, "[I]t looks kind of dicey for a trademark infringement claim relating to this sale." (Transcript of May 20, 2011 argument ("Tr."), attached as Exh. 11 to Crossman Decl., at 11). Given that Kari and Miranda were selling authorized merchandise that had been sold to them by FSM, a claim of trademark infringement was indeed "dicey."

Judge McMahon also remarked on the fact that FSM was really being hoisted on its own petard concerning any confusion between the 71st Street store and FSM's stores:

> T]he company, the LLC is hoisted by its own petard because having entered into an agreement with the ladies that insists that the [71st Street Store], which the company did not own, would be perceived by the public, erroneously, as being a Sigerson Morrison store, it's difficult for them to complain when the actual owners of that store, who happened to be named Sigerson [and] Morrison, sell off the inventory of that store in order to satisfy a demand for payment made by the LLC."  (Tr., Exh. 11 to Crossman Decl., at 10).

The Court Allows The Sale

Based upon a review of the license agreement and the relevant caselaw, at 12:58 p.m., Judge McMahon vacated her TRO to allow the sale to proceed. Judge McMahon did also restrain Kari and Miranda, pending the upcoming hearing before this Court, from conducting any subsequent sale *after* Sunday, May 22, 2011. That TRO remains in effect and should be vacated upon the hearing before this Court set for Tuesday, May 31, 2011.

From Friday, May 20, through Sunday, May 22, Kari and Miranda held the sale. Kari and Miranda sold all of there inventory except less than 100 pairs of shoes, less than

20 handbags, and less than 20 pairs of gloves. (Morrison Decl. at ¶ 21). Kari and

Miranda do not plan to conduct another sale because it would not be worthwhile, in light

of the limited inventory remaining. (Miranda Decl. at ¶ 22). However, Kari and Miranda

should be free of any restriction on liquidating that remaining inventory, including the

restriction on subsequent sales contained in Judge McMahon's second order of last week.

Aside from the sale proceeds (and a tax refund) Kari and Miranda have not

received any income  or payments of any kind since they were suddenly fired by FSM

over two months ago. (Miranda Decl. at ¶¶ 2-4; Sigerson Decl. at ¶4). Kari and

Miranda are the sole earners of income in their families, and they are concerned that it

they are not permitted to start working again in shoe designing, they will become

destitute and lose the means to provide for their families. (Miranda Decl. at ¶¶ 5-7;

Sigerson Decl at ¶¶ 5-7). The actions of FSM on the instant motion have created and

exacerbated a shadow of litigation and injunctions that hangs over Kari and Miranda,

making it impossible for them to obtain employment. The only cure for that is a clear

ruling by this Court that no such restrictions are appropriate.

## ARGUMENT

## I.

## PLAINTIFF HAS NOT PROVEN THE ELEMENTS FOR AN INJUNCTION

In order to obtain a preliminary injunction, a plaintiff must satisfy a four-factor

test before a court may grant such relief. "A plaintiff must demonstrate: (1) that it has

suffered an irreparable injury; (2) that remedies available at law, such as monetary

damages, are inadequate to compensate for that injury; (3) that, considering the balance

of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4)

that the public interest would not be disserved by a permanent injunction." *eBay, Inc. v. MercExchange*, 547 U.S. 388, 391 (2006); *Salinger v. Colting*, 607 F.3d 68, 74-75 (2d Cir. 2010) (reversing injunction in copyright action, noting that Second Circuit standards for the granting of a preliminary injunction had been abrogated by *eBay, Inc*.).  A plaintiff must satisfy all four requirements in seeking injunctive relief in intellectual property cases. *Salinger,* 607 F.3d at 77-78, n. 7.  In determining the balance of hardships, the Court considers whether there is a likelihood of success on the merits.  Id. at 79.

In a trademark case, a plaintiff faces a higher threshold in order to satisfy its burden for an injunction.

> [T]he foremost trademark authority has stated that when the hardship balance does not tip decidedly or significantly in favor of the plaintiff, then the plaintiff must prove the probability (not mere possibility) of success on the merits; in other words, the plaintiff must have a very clear and strong case.  [T]o doubt is to deny; thus, if there is doubt as to the probability of plaintiff's ultimate success on the merits, the preliminary injunction must be denied.

*MicroStrategy Inc. v. Motorola, Inc*., 245 F.3d 335, 339 (4th Cir. 2001) (internal cites and quotation marks omitted).

"Irreparable harm is an injury that is not remote or speculative but actual and imminent, and 'for which a monetary award cannot be adequate compensation.'" *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 37 (2d Cir. 1995).  Irreparable harm exists only where there is a threatened imminent loss that will be very difficult to quantify at trial.  *Id*. at 38.  In considering harm, the court should consider the harm of error, *i.e*., the harm to the defendant and the public if an injunction is granted but trial reveals that the trademark owner is not entitled to relief.  *Scotts Co. v. United Indus. Corp*., 315 F.3d 264,

284-285 (4th Cir. 2002) ("the real issue in this regard is the degree of harm that will be

suffered by the plaintiff or the defendant if the injunction is *improperly* granted or

denied").  FSM has not met its burden.

## II.

### PLAINTIFF IS UNLIKELY
### TO SUCEED ON THE MERITS

Even after *e-Bay*, the first consideration in the preliminary injunction analysis is

the probability of success on the merits.  *Salinger,* 607 F.3d at 80.  As we discuss in this

section, plaintiff's probability is not "improbable;" it is "impossible."

**A.**     **Plaintiff's Application Is Based Upon Errors**

In an order to show cause application, a party has a heightened duty to disclose

fully and accurately in light of the burden and expense to the Court and the parties of

such emergent proceedings, and the multiplicity of proceedings that may generate.

*Sangui Biotech Intern., Inc. v. Kappes*, 179 F.Supp.2d 1240, 1246 (D.Colo. 2002) ("I

consider the failure to disclose such information to be vexatious and unreasonable and the

conduct multiplied the proceedings because it resulted in an OSC being issued and a

hearing held.");  *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,* 2002 WL 59434, * 1(S.D.N.Y.

2002)("rather than risk offending and possibly losing a client, counsel simply closed their

eyes to the overwhelming evidence that statements in the client's affidavit were not

true"); *Jondora Music Publ'g Co. v. Melody Recordings, Inc.,* 351 F.Supp. 572, 576

(D.N.J.1972) (affidavits which misrepresented facts constituted a fraud on the court,

warranting dissolution of previously entered injunction).

Here, FSM obtained a temporary restraining order from this Court based upon an emergent application which included statements that were incorrect, and which FSM should have known were incorrect. When the first TRO was vacated, FSM then obtained a second temporary restraining order as to future sales, which order remains in effect. The incorrect statements in FSM's papers include:

- Plaintiff incorrectly claims that Kari and Miranda "misleadingly promoted [the sale] as a 'final' going out of business Sigerson Morrison sale," and "went to great lengths . . . to mislead consumers that SIGERSON MORRISON brand was going out of business and that SIGERSON MORRISON shoes will not longer be produced." (Minsker Aff. of Exigent Circumstances ¶3; Minsker Aff. in Support of Order to Show Cause ¶23). To the contrary, the Kari and Miranda <u>never</u> advertised this as a "going out of business" sale. (Morrison Decl. at ¶¶ 18, 25).

- Plaintiff incorrectly claim that it "has not authorized . . . any . . .use by Defendants of the SIGERSON MORRISON mark." (Minsker Aff. of Exigent Circumstances ¶3). To the contrary, as Judge McMahon observed last week, Kari and Miranda are authorized to sell FSM shoes per the License Agreement. (Morrison Decl. at ¶ 27).

- Plaintiff incompletely claims that "Pursuant to Section 11(a) of the Employment Agreements, Defendants agree not to engage in any business that competes with FSM for a period of twelve months after termination of Defendants employment with FSM." (Minsker Aff. in Support of Order to Show Cause ¶15.) But FSM fails to inform the court that pursuant to that same provision, "if the Employee is terminated by the Company without Cause" – which is in dispute here – "the non-compete Period shall terminate on the date of such termination." (Exh. 2 to Sigerson Decl. and Exh. 2 to Morrison Decl.).

- Plaintiff incorrectly claim that "[D]efendants were under a contractual obligation not to use the names 'Sigerson' *or* 'Morrison.'" (Pl. Mem. of Law at p. 11). But the APA does not expressly limit Kari and Miranda's use of their own surnames; it only limits them from using the term "Sigerson & Morrison, or any derivative thereof."

**B.    <u>FSM's Trademark Claims Are Not Likely To Succeed</u>**

In order to prevail for trademark infringement under Section 32(1) of the Lanham Act 15 U.S.C. §1114(1), a plaintiff is required to show that its marks are valid and entitled to protection and that a defendant's use of those marks is likely to cause

consumer confusion as the origin or sponsorship of the defendant's goods. *Virgin Enters. Ltd v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003). FSM has failed to make a showing of trademark infringement here because Kari and Miranda are reselling original goods, pursuant to a valid license agreement. Moreover, FSM's attempt to limit Kari and Miranda's use of their surnames should be rejected because (i) FSM has no trademark rights in such names, and (ii) the names are subject to the Fair Use Defense. Thus, plaintiff's Lanham Act claims fail as a matter of law and should be dismissed.

      1.    Kari and Miranda Have The Right To
                Resell FSM Shoes Per The First Sale Doctrine

In order to make a claim for infringement for unauthorized sales of a trademark product, plaintiff must satisfy the following two part test set out by Judge Haight in *Ryan v. Volpone Stamp Company*, a case relied upon by Judge McMahon:

> A court faced with an infringement claim for unauthorized sales of a trademarked product must perform a two-part analysis. First, the court must consider whether the trademark owner authorized the first sale of goods. Second, the court must consider whether the goods were genuine. If the initial sale was authorized, the court must undertake the second part of the analysis and determine whether, as a matter of fact, the good which were later resold without authorization were genuine. If the goods were genuine, there is no violation of the Lanham Act ***despite the fact that the goods were resold without the trademark owner's consent***.

*Ryan*, 107 F. Supp. 2d 369 (S.D.N.Y. 2000)(emphasis added). FSM does not dispute that Kari and Miranda purchased the shoes pursuant to an authorized sale. (*See*, Exh. 11 to Crossman Decl., Tr. at 2; *see also*, License Agreement.) Nor is there any dispute that the shoes sold by Kari and Miranda are genuine goods. Thus, per the first sale/exhaustion doctrine, where --as here -- there is an initial authorized sale by the trademark owner, and a subsequent resale of genuine goods, there is no trademark infringement. *O.D.F.*

*Optronics Ltd. v. Remington Arms Co*, 2000 WL 4410130 (S.D.N.Y. 2008)(applying first sale/exhaustion rule and finding no infringement); *Rogers v. HSN Direct Joint Venture*, 1999 WL 728651 at *3 (S.D.N.Y. Sept. 17, 1999)(same).

Moreover, there is no chance of "confusion" or "intent to deceive" because the shoes *are* the defendant's original goods. *Cf, Polymer Technology Corp. v. Mimran*, 975 F2d 58, 61 (2d Cir. 1992)( "As a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the owner.") Thus, the trademark infringement cases cited by plaintiff are inapposite. As Judge McMahon correctly concluded: "The real problem here, *the real confusion here is not over the shoes and the authenticity of the shoes*. The real problem here is over whether Fisher Sigerson Morrison, the owner of the trademark which plans to manufacture more shoes in the future, is going out of business." (Tr., Exh. 11 to Crossman Decl., at 12.) (emphasis added). That confusion is of FSM's own creation because it was FSM who required, as part of the License Agreement, that Kari and Miranda operate the 71st Street Store in a manner that made the store appear to the public to be an FSM store. (License Agreement at 2).

2.   FSM Did Not Acquire The Right To Use "Sigerson" or "Morrison"

FSM incorrectly argues that Kari and Miranda engaged in "bad faith" by their use of their own names, "Sigerson" and "Morrison" (Mem. of Law. at 10.), but FSM does not own and has never acquired the right to use the individual surnames "Sigerson," "Kari Sigerson," "Morrison," or "Miranda Morrison." *Dutcher v. Harker*, 377 S.W.2d 140, 145-47 (Mo. Ct. App. 1964)(where plaintiff sold the mark "'Dutcher-Williams," it did not give up the right to use "Charles Dutcher" or "Dutcher" in the singular). FSM is the

owner of **only** the "SIGERSON & MORRISON" trade name, trade mark, etc. in that mark, and "any name similar thereto or variation thereof" (APA p.1, definition of Acquired Assets, subd. (g)).  Likewise, Section 4.02 of the APA only limits Kari and Miranda's use of the conjoined name:

> <u>No use of Name</u>.  It is acknowledged that Purchaser would be irreparably damaged if LLC and/or UK, use the names or trade name "Sigerson & Morrison", or any derivatives thereof, in connection with any products or any services which might cause confusion with the products and services offered by the business of LLC, and sold by the Surviving Corporation, or any Affiliate of Purchaser LLC or UK covenant and agree that they will not use such names, trade names, or any derivatives thereof, in connection with any products and/or services which might cause confusion in the marketplace with any products and/or services offered by Purchaser, the Surviving Corporation, and any Affiliate of Purchaser.

FSM *could have* negotiated a provision in the APA expressly limiting Kari and Miranda's use of their surnames, but it chose not to do so.  *See e.g.*, *JA Apparel Corp. v. Abboud*, 682 F.Supp.2d 294 (S.D.N.Y. 2010)(under purchase agreement, designer Joseph Abboud sold certain assets and trademarks, including the use of the name "Joseph Abboud"); *Ralph Bros. Furniture Co. v. Ralph*, 45 U.S.P.Q. 375 (Pa. 1940)("The principle is fundamental that an individual is entitled to the use of his own name in his business, unless he has by contract deprived himself of that right.").

Moreover, "[t]o prohibit an individual from using his true family surname is to 'take away his identity: without it he cannot make known who he is to those who may wish to deal with him; and that is so grievous an injury that courts will avoid imposing it, if they possibly can.'" *Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731 (2d Cir. 1978)(finding defendant was authorized to use his surname if it was accompanied by a disclaimer that he was not affiliated with plaintiff company).  Accordingly, as a general rule, injunctions in trademark cases involving use of an individual's personal name

should be narrowly tailored.  *Id.*, *Joseph Scott Co. v. Scott Swimming Pools*, 764 F.2d 62 (2d Cir. 1985)(narrowing injunction and noting, "courts have often noted their concern that injunctions in cases [involving surnames] be drawn as narrowly as possible"); *JA Apparel Corp.*, 682 F. Supp. 2d at 318 (S.D.N.Y. 2010)("[A]s a general matter, injunctions in trademark cases involving the use of an individual's personal name should be narrowly tailored.").

Furthermore, in determining the scope of an injunction, courts will consider whether a user has developed her own reputation in the business.  *Joseph Scott Co. v. Scott Swimming Pools*, 764 F.2d 62 (2d Cir. 1985).  Kari and Miranda have been in the shoe business for approximately twenty years and they would suffer great harm if they could no longer use their own surnames to identify themselves, especially in light of the circumstances here, given that they took the added precautions to disclaim any affiliation with FSM.  Accordingly, FSM's attempt to claim rights in names that were never assigned to it, and to claim infringement with respect to the individual surnames in which it was granted no rights, should be denied.

      3.      The Surnames "Sigerson" and "Morrison"
                <u>Are Subject To The Fair Use Defense</u>

Even if FSM had any rights in the discrete names "Sigerson" or "Morrison" (and they do not), the use of such terms would be subject to the fair use defense.  The fair use defense is an absolute defense to claims of trademark infringement and trademark dilution.  Such a defense is available where:

> the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good

> faith only to describe the goods or services of such party, or their
> geographic origin.

*JA Apparel Corp. v. Abboud*, 568 F.3d 390 (2d Cir. 2009).  Thus, in assessing whether the fair use defense is applicable, courts assess whether the term is used (1) descriptively, (2) other than as a mark, and (3) in good faith.  *Id*.  In making these assessments, the court focuses on the actual or proposed uses themselves.  *Id*.  Here, Kari and Marinda have used their surnames descriptively, simply to identify themselves, and not in a trademark sense. They have done so in good faith.  Their use of the trademark "Sigerson Morrison" is licensed to them to sell the shoes in question.

It is worth pointing out that even if Kari and Miranda had used their surnames as a way of identifying themselves in work on some new line of shoes or some new business venture, such use would still be considered a descriptive non-trademark use.  *JA Apparel Corp. v. Abboud*, 682 F.Supp.2d 294, 311 (S.D.N.Y. 2010) (finding Abboud used his name in its descriptive non-trademark sense to "alert viewers that Abboud, the individual, is the designer behind the new clothing line").  Moreover, there has been no evidence of bad faith here.  In fact, Kari and Miranda have expressly disclaimed any affiliation with FSM and its shoes, which is evidence of their good faith. *Id*.  Thus, even if FSM had any rights in defendants' last names, the fair use defense would protect such use by defendants.

**C.     FSM Cannot Obtain An Injunction Enforcing the Covenant Not To Compete Because Kari and Miranda Were Terminated Without Cause**

Pursuant to its Second Cause of Action, denominated "Breach of Contract – Employment Agreements," FSM seeks an injunction against defendants based upon an

alleged covenant not to compete contained in defendants' respective employment agreements. However, the Employment Agreements provide that the covenants not to compete terminate on the same date that defendants are terminated, unless defendants are terminated "for cause." Because, for the reasons indicated below, defendants were not terminated for cause as provided in the Employment Agreements, the Employment Agreements' non-competition clauses have already expired and cannot form a basis for relief here. And conversely, proof of termination "for cause" (and in the manner provided in the agreements) is a necessary element of FSM's request for an injunction.

FSM has asserted illusory "cause" for termination for the obvious purpose of attempting to evade FSM's substantial payment obligations to defendants. This is more fully alleged in the State Court Complaint (Exh. 1 to Crossman Decl.).

On this motion, FSM has failed to prove that defendants were terminated for cause. On the day that defendants were terminated, FSM gave termination letters to defendants.  (Exhs. 13 and 14 to Minsker Aff.) Those letters asserted that defendants were being terminated for "cause," but the purported "cause" mentioned in the termination letters was that defendants each "materially breached the Employment Agreement by failing to produce a presentable Sigerson Morrison footwear line for the December 2010 market (which is a critical and essential responsibility of such position)." (Termination Letters, Exhs. 13 and 14 to Minsker Aff).

This purported "cause" is not cause for termination of the Employment Agreements. First, the Employment Agreements create no responsibility for defendants to produce a footwear line for the December 2010 market. No such market was served by FSM at the time that the Employment Agreements were signed. Indeed, FSM unilaterally,

without agreement of defendants, without modifying the Employment Agreements, and without providing consideration to defendants, simply declared that defendants should produce a line of shoes for the December 2010 market. Therefore as a matter of fact no such responsibility is included in the responsibilities set forth in the Employment Agreements, and the alleged "failure" to produces such a line cannot constitute cause for termination.

In addition, the defendants' Employment Agreements expressly require that any attempt to terminate for cause be preceded by delivery "to Employee a Notice of Termination specifying the particulars thereof in detail and affording the Employee fifteen (15) days to cure such act or omission unless such act or omission is incapable of being cured." (Employment Agreement ¶ 7(c)). Furthermore, the Employment Agreements specify that "a 'Notice of Termination' shall mean a notice which shall indicate the specific grounds for termination relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of Employee's employment under the provision so indicated."  (Employment Agreement ¶ 8(a)). The failure of FSM to give an opportunity to cure is an especially important point on this motion because it provides a "bright line" reason to invalidate the purported termination for cause. Nor is it any counterargument for FSM to claim that the failure to deliver a presentable line was "incapable of being cured." If the failure to deliver is the "cause," then defendants should have had fifteen days in which to "deliver."

Although defendants did produce a line of shoes for the 2010 market, defendants and FSM jointly made a decision in December 2010 to withhold that line from the market, and to instead save the line for the February market. FSM voiced no objection or

complaint in December. Moreover, in December 2010, FSM failed to give notice to defendants that it deemed any of defendants conduct to be a breach of the Employment Agreements or that termination was contemplated. Nor did FSM give defendants fifteen (15) days to cure any such breach. Instead, three months later, after the February market, on March 10, 2011, FSM suddenly and unexpectedly delivered the notices of termination. Not only that, FSM in those notices stated that this alleged breach "is incapable of being cured." (Exhibits 13 and 14). Manifestly, even if defendants had an obligation regarding the December market (which they deny having), if FSM had given notice of such a claim in December, it might well have been capable of being cured. Having failed to give timely notice, and having offered no excuse for delaying the notice for three (3) months, FSM cannot now claim that it was entitled to give notice and to assert that the notice "was incapable of being cured."

Furthermore, the claimed "failure to produce a presentable Sigerson Morrison footwear line for the December 2010 market" is not a sufficient statement of specific grounds for termination relied upon and does not set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination. (Employment Agreements ¶ 8(a)). Furthermore, because FSM was obligated to set forth in reasonable detail those facts and circumstances in the Termination notice, FSM should be barred now from supplementing that detail. Either the notice contained sufficient detail of "cause" or there was no cause.

In addition, the mutual decision to withhold the December 2010 footwear line until February was the result of events and actions caused by FSM, and not defendants. For example, and as is more specifically alleged in the State Court Action commenced by

defendants (Exh. 1 to Crossman Decl.), FSM closed the Italian office, cheated the Italian factories, and unilaterally added to the responsibilities of defendants, all of which contributed to slowing the responsiveness of the Italian Factories. Accordingly, as a matter of fact, the alleged decision to withhold the December 2010 footwear line was caused by the fault of FSM, not defendants.

For all of these reasons, Defendants were not terminated for cause as required by the Employment Agreements. The Non-competition clause in the Employment Agreements provides that if the employee is terminated by the company "without cause," then the non-competition period terminates when the employee's employment terminates. (Employment Agreements ¶ 11(a), final sentence). Therefore the covenants not to compete contained in the Employment Agreements cannot be activated or relied upon by FSM.

Even if the covenants not to compete were applicable (which they are not), they would not be enforceable because they are unreasonable, overbroad and not supported by adequate consideration. *GFI Brokers, LLC v. Santana*, 2008 WL 3166972 at *9 (S.D.N.Y. Aug. 6, 2008) ("Where the terms of a non-compete provision are unrestrained by any limitations keyed to uniqueness, trade secrets, confidentiality or ... competitive unfairness, the provision does no more than baldly restrain competition, and it is too broad to be enforced as written.") (internal citations omitted)*; Photonics Industries Intern., Inc. v. Zhao*, 39 A.D.3d 610, 611 832 N.Y.S.2d 298, 299 (2d Dep't 2007) (dismissing appeal of an order finding noncompetition clause unenforceable because "its terms were unreasonable and would impermissibly restrict [employee] from making a living"); *Kanan, Corbin, Schupak & Aronow, Inc. v. FD International, Ltd.*, 8 Misc.3d

412, 419, 797 N.Y.S.2d 883, 888 (Sup. Ct. N.Y Cty. 2005) (refusing to enforce overbroad non-compete covenant).

**D.      Plaintiff's Claims Are Subject To Dismissal For Prior Action Pending**

It is clear that "in the interests of judicial economy, comity, and federalism," a Federal action may be stayed or dismissed pending decision in an identical prior state court action.  *CBS, Inc. v. Tee Vee Records, Inc*., 96 F.R.D. 163, 165 (D.C.N.Y. 1982)(internal citations omitted).

Plaintiff's first and third causes of action are for breach of contracts that are before the State Court, and part of the State Court Action.  (See State Court Complaint, ¶¶ 149-154, 193-197, annexed as Exhibit 1 to Crossman Decl.). As a consequence, Plaintiff's first and third causes of action are subject to dismissal on grounds of judicial economy, federalism and comity, because a prior action is pending.

**E.      Plaintiff's Breach of the Employment Contract
         Precludes Plaintiff From Suing On That Contract**

FSM seeks injunctive relief in "enforcing the restrictive covenant in the employment agreements executed by the defendants," but FSM has breached the agreements and is therefore precluded from such recovery. *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 117 (2d Cir. 2006) ( "When a party has breached a contract, that breach may excuse the nonbreaching party from further performance if the breach is 'material.'"); *Hartzell v. Burdick*,  91 Misc.2d 758, 759, 398 N.Y.S.2d 649, 650 (N.Y.City Ct. 1977) ("A breach of contract by one party relieves the other from obligations under it and renders the covenants unenforceable by the one who has breached it."); *see also*, State Court Complaint, attached as Exh.1 to Crossman Decl.

Even more, "[i]n cases of involuntary discharge, if the employment has been terminated by the employer without cause, the employer will not be permitted to invoke [a non-compete] covenant" because "discharge of an employee without cause before the expiration of the term of his contract constitutes a breach of the contract by the employer, thereby depriving it of the right to the enforcement of the other conditions thereof." *Borne Chemical Co. v. Dictrow*, 85 A.D.2d 646, 649, 445 N.Y.S.2d 406, 412 (2d Dep't 1981); *Cornell v. T. V. Development Corp.*, 17 N.Y.2d 69, 75, 215 N.E.2d 349, 352 (NY 1966)("a covenant [against competition] is valid and enforcible, but not when the party benefited was responsible for the breach of the contract containing the covenant").  As established infra at Section C, pp. 18-23,  Kari and Miranda were terminated without cause, therefore FSM is precluded from invoking the covenant not to compete.

## III.

### If An Injunction Is Entered, Defendants Should Post A Bond

FRCP 65(c) states that the court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The court has broad discretion in setting a security bond.  *Conn. Gen. Life Ins. Co. v. New Images of Becerly Hills*, 321 F.3d 878, 882 (9th Cir. 2003).

A party has been wrongfully enjoined if it is ultimately found that the enjoined party had at all times the right to do the enjoined act.  *Blumenthal v. Merril Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1054 (2d Cir. 1990).  Because the injured

24

party's recovery is generally limited to the amount of the bond, it is important that the bond be appropriately set.

As set forth in the accompanying Declarations of Kari and Miranda, an injunction against using their names in the singular would preclude their ability to earn a livelihood, and Kari and Miranda face becoming destitute.  A bond should be imposed that would compensate Kari and Miranda against the extreme hardships they would face, including lost income, homelessness, and harm to their children and dependents.

**CONCLUSION**

For the foregoing reasons plaintiff's motion for a preliminary injunction should be denied, the TRO entered by Judge McMahon (the second TRO) should be vacated, and an award of costs, expenses and attorney's fees made in favor of defendants.

Dated: New York, New York
          May 25, 2011

                                        Respectfully submitted,

                                        ZUKERMAN GORE BRANDEIS
                                         & CROSSMAN, LLP


                                        By_____S/_____
                                              John K. Crossman (JC 7387)
                                        875 Third Avenue
                                        New York, New York 10022
                                        Telephone: (212) 223-6700
                                        Email:  jcrossman@zgbcllp.com